UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -against-

ANTHONY LAURIA,
BRIAN RODRIGUEZ, and
ANTHONY MOLINA,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __09/24/2020__

19-CR-449-01 (NSR)
19-CR-449-02 (NSR)
19-CR-449-03 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Defendants Anthony Lauria ("Lauria"), Brian Rodriguez ("Rodriguez"), and Anthony Molina ("Molina") (collectively, "Defendants") are charged by Indictment with: two counts of conspiring to commit robbery, in violation of 18 U.S.C. § 1951; one count of committing robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951 and 2; and one count of using and carrying a firearm that was brandished during and in relation to second robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. (Indictment, ECF No. 20.)

Before the Court are Defendants' pretrial motions (1) for suppression of evidence; (2) for severance; (3) for disclosure of Rule 404(b) evidence and other crimes evidence; (4) for disclosure of *Brady*, *Giglio*, or 3500 material; (5) for inspection of grand jury records; and (6) to dismiss Count Four of the Indictment for failure to state a claim. (Lauria Memorandum of Law in Support of Motions ("Lauria Mot."), ECF No. 65; Declaration of Samuel M. Braverman ("Braverman Decl."), ECF No. 64, Ex. C ("*Pro Se* Lauria Mot."); Rodriguez Motion to Suppress and for Other Relief, ECF No. 52 ("Rodriguez Mot."); Molina Memorandum of Law in Support of Motion to Suppress, ECF No. 55, ("Molina Mot."). For the following reasons, Defendants' Motions are

GRANTED in part and DENIED in part.

**BACKGROUND**

The facts herein are drawn from the criminal complaint filed in this matter (Complaint ("Compl."), ECF No. 2), the Indictment, and the parties' submissions.  The three defendants are charged in in two Hobbs Act Robberies of Verizon Wireless stores: First, on August 10, 2017 in New Milford, Connecticut and second, on February 15, 2019, in Mahopac, New York.

**I.      The 2017 New Milford Armed Robbery**

At approximately 7:22 p.m., on August 10, 2017, an individual—who was captured on surveillance video and allegedly identified on that video as Lauria—entered a Verizon Wireless Zone store in New Milford, Connecticut (the "New Milford Store"), and spoke to an employee about purchasing an iPhone.  (Compl. ¶ 6).  Lauria left the store without making a purchase, and walked toward a dark-colored Honda Accord with distinctive rims, leaving a fingerprint on the Store's door. (*Id.* ¶¶ 5–8, 16(a)).  Minutes later, two individuals allegedly identified as Rodriguez and Molina—one masked and brandishing a firearm, the other wearing a cap and sunglasses—got out of the Honda Accord, walked into the store, restrained the store's employees with zip ties, and stole Apple iPads and iPhones valued at approximately $48,000.  (*Id.* ¶¶ 9–13).

**II.      The 2019 Mahopac Armed Robbery**

At approximately 7:40 p.m., on February 15, 2019, the dark-colored Honda Accord with distinctive rims drove into in the parking lot of a Verizon Wireless Zone store in Mahopac, New York (the "Mahopac Store").  (*Id.* ¶ 18).  Minutes later, allegedly leaving Lauria in the Honda as the getaway driver, Molina and Rodriguez—one masked and brandishing a firearm, the other wearing a hat and sunglasses (and one repeatedly calling the other "Brian")—walked into the store,

restrained the store's employee with zip ties, and stole Apple iPads and iPhones valued at approximately $54,000. (*Id.* ¶¶ 18–21, 23–25).

## III.   **The Investigation**

In 2017, the New Milford Police Department (the "NMPD") began investigating the 2017 New Milford Robbery.  (*See* Memorandum of Law of the United States of America in Opposition to Defendants' Pretrial Motions ("Gov. Opp."), ECF No. 72, at 3.)  Among other things, they interviewed witnesses, obtained Lauria's fingerprint from the door of the New Milford Verizon store, and obtained video surveillance.  (Compl. ¶¶ 5–14, 16(a)).

### a.   **Connecticut Anonymous Tip and Warrants**

In January 2018, the Connecticut States Police (the "CSP") contacted the NMPD to share an anonymous tip received from two people who arrived unexpectedly at the CSP Barracks in Westbrook.  (*Id.* ¶ 15).  The tipsters said they watched an online video of the New Milford Robbery, and identified the robbers as Lauria, Rodriguez, and Molina, providing contact information for each.  (*Id.*).  Shortly after receiving the anonymous tip, a judge of the Connecticut Superior Court issued warrants for historical cell site and toll records for two phone numbers: (914) 562-3972 (believed to belong to Lauria); and (914) 649-1912 (believed to belong to Rodriguez).  (Compl. ¶¶ 16–17; Molina Mot. Ex. C ("New Milford 3972 Cell Site Warrant"); Molina Mot. Ex. D ("New Milford 1912 Cell Site Warrant")).  Phone records showed that, during August 2017, those two phones were used exclusively in New York, except for the date of the 2017 New Milford Robbery, when they were used in New Milford, Connecticut.  (Compl. ¶¶ 16–17).

### b.   **Toll Records and Cell Site Warrants**

In 2018, among other things, the NMPD subpoenaed toll records for Rodriguez's 1912 phone.  (Gov. Opp. at 4.)  Those records showed that, on the date of the 2017 New Milford Robbery, between 3:06 p.m. and 11:47 p.m., Rodriguez's 1912 phone communicated at least six

times with Lauria's 3972 phone, and at least seven times with phone number (917) 789-4879, which the Government has since determined belonged to Molina.  (Gov. Opp. at 4–5.)

After the 2019 Mahopac Robbery, the FBI got involved.  (Gov. Opp. at 5.)  On March 4, 2019, the Honorable Lisa Margaret Smith, United States Magistrate Judge, issued a so-called "tower extraction" warrant, directing a number of telephone service providers to provide the FBI with the telephone numbers that accessed the cell tower nearest the Mahopac store around the time of the 2019 Mahopac Robbery namely, 6:30 p.m. through 8:30 p.m., Eastern Standard Time. (Molina Mot. Ex. E ("March 4 Tower Extraction Warrant").)

The Sprint tower log shows Lauria's 3972 phone—which used the Sprint network—using a nearby cell tower to communicate with both Rodriguez's 1912 phone—as well as phone number (917) 254-2454, believed to belong to Molina—prior to the robbery.  (Gov. Opp. at 5–6.) Similarly, the AT&T tower log showed Rodriguez's 1912 phone—which used the AT&T network—accessed a cell tower near the 2019 Mahopac Robbery when it communicated with Lauria's 3972 phone prior to the robbery.  (Gov. Opp. at 6.)  Molina's 2454 phone used the T-Mobile network.  (Gov. Opp. at 6.)  T-Mobile's tower log did not show what cell tower Molina's 2454 phone was using when it communicated with Lauria's 3972 phone prior to the 2019 Mahopac Robbery.  (Gov. Opp. at 6.)  Toll records for Lauria's phone showed that Lauria's 3972 phone communicated with Rodriguez's 1912 phone repeatedly on the day of the 2017 New Milford Robbery, as well as with Rodriguez's 1912 phone and Molina's 2454 phone repeatedly on the day of the 2019 Mahopac robbery, including prior to the robbery.  (Gov. Opp. at 7.)

On March 29, 2019, Judge Smith issued a warrant for cell site and toll record information for Lauria's 3972 phone, Rodriguez's 1912 phone, and Molina's 2454 phone.  (Molina Mot. Ex. F ("March 29 Cell Site Warrant").)  The records obtained pursuant to this warrant demonstrated,

among other things, that all three phones were near the Mahopac store at the time of that robbery, but were not used in Mahopac at any other time in February 2019. (Compl. ¶¶ 24(j)–(l), 24(m), 25(f)).

On April 23, 2019, the Honorable Paul E. Davison, United States Magistrate Judge, issued a warrant for prospective and historical location information and toll record information for Rodriguez's 1912 phone, and Molina's 2454 phone. (Molina Mot. Ex. G ("April 23 GPS Warrant").)

### c. Complaint Filed

On April 29, 2019, the Honorable Judith C. McCarthy, United States Magistrate Judge, executed the Complaint, finding probable cause to believe that: (1) Lauria and Rodriguez conspired to commit the 2017 New Milford Robbery, in violation of 18 U.S.C. § 1951; (2) Lauria, Rodriguez, and Molina conspired to commit the 2019 Mahopac Robbery, in violation of 18 U.S.C. § 1951; and (3) Lauria, Rodriguez, and Molina used and carried a firearm that was brandished during and in relation to the 2019 Mahopac Robbery conspiracy, and aided and abetted the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (2). In connection with the Complaint, Judge McCarthy also issued warrants permitting the use of cell site simulator—commonly referred to as a "Triggerfish"—for Rodriguez's 1912 phone and Molina's 2454 phone, to allow law enforcement agents better to locate and arrest the defendants. (Rodriguez Mot. Ex. D ("April 29 Rodriguez Triggerfish Warrant"); Molina Mot. Ex. H ("April 29 Molina Triggerfish Warrant").)

Also on April 29, Judge McCarthy issued a warrant for cell site and toll record information for phone number (718) 810-1273, believed to belong to Molina. (Molina Mot. Ex. I ("April 29 Cell Site Warrant").)

### d. Arrests of Defendants and Seizure of Property

The following day, using a Triggerfish, law enforcement located and arrested Molina in

his basement bedroom. (Molina Mot. Ex. Q ("Molina Arrest 302") & Ex. J ("April 30 iPhone Warrant") Aff. ¶ 19(a).) While clearing the bedroom, agents seized the black iPhone. (Molina Arrest 302). That same day, again using a Triggerfish, law enforcement located and arrested Rodriguez in his basement apartment, and seized a red iPhone 8. (April 30 iPhone Warrant Aff. ¶ 18).

Later that same day, Judge McCarthy issued a warrant permitting law enforcement to search the black iPhone seized in conjunction with Molina's arrest and the red iPhone seized in conjunction with Rodriguez's arrest. (April 30 iPhone Warrant). Among other things, Rodriguez's iPhone, which used Rodriguez's 1912 number, contained at least seven saved contacts for "Molina," including an entry for Molina's 4879 number—which was repeatedly in contact with Rodriguez's 1912 number on the day of the 2017 New Milford Robbery—labeled "Molina 4."

On May 23, 2019, Judge McCarthy issued a warrant for cell site and toll records for Molina's 4879 number. (Molina Ex. K ("May 23 Cell Site Warrant").) Records obtained pursuant to that warrant showed that Molina's 4879 phone was in New Milford the day of the 2017 New Milford Robbery. (Gov. Opp. at 10.) That same day, Judge McCarthy issued a warrant permitting a supplemental search of Rodriguez's red iPhone. (Rodriguez Mot. Ex. E ("May 23 iPhone Search Warrant").)

The following month, on June 3, 2019, Judge Davison issued a warrant permitting law enforcement to obtain DNA samples from each of the defendants, which would allow law enforcement to compare the defendants' DNA to DNA found on a zip-tie used to bind a victim of the 2019 Mahopac Robbery. (Molina Mot. Ex. L ("June 3 DNA Warrant").) Forensic analysis revealed that Molina's DNA could be included as a contributor to the DNA on the zip tie, and that the likelihood of selecting an unrelated individual whose DNA could be included in the mixture

was 1 in approximately 39.98 million.  (Rodriguez Mot. Ex. G ("DNA Report").)

  **e.   Indictment and Subsequent Events**

  Two weeks later, on June 17, 2019, a grand jury in this District returned Indictment 19 Cr. 449 (NSR), which charged each of the defendants with: (1) conspiring to commit the 2017 New Milford Robbery, in violation of 18 U.S.C. § 1951; (2) conspiring to commit the 2019 Mahopac Robbery, in violation of 18 U.S.C. § 1951; (3) committing the 2019 Mahopac Robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1951 and 2; and (4) using and carrying a firearm that was brandished during and in relation to the 2019 Mahopac Robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

  Subsequently, on August 29, 2019, Judge Davison issued a warrant for iCloud data related to seven iCloud accounts: whyteboi914@yahoo.com, jasmine.maniram20@gmail.com, god-freygrant10@gmail.com, slowpokebe@outlook.com, chillprimo23@gmail.com, anthonyjuli-anomolina@gmail.com; and vivijoy@icloud.com.  (Rodriguez Mot. Ex. F ("August 29 iCloud Warrant").)

## DISCUSSION

  The Fourth Amendment prohibits "unreasonable searches and seizures," and the Warrants Clause mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  For a search warrant to be considered valid, the law requires there be "probable cause to believe that a crime has been, is being, or is about to be committed . . . ."  *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).  The probable-cause determination "is not overly strict."  *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005).  "Presented with a warrant application, [a] judge must 'simply . . . make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis

of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

"The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). In assessing probabilities, "a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). Such determinations must be approached in a practical way, because "probable cause is a flexible, common-sense standard." *Gates*, 462 U.S. at 231–32; *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the totality-of-the-circumstances approach includes a recognition of the training and experience of law enforcement agents in assessing human behavior and evidence. *See Gates*, 462 U.S. at 231–32.

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The issuing magistrate's decision is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (internal quotation marks omitted); *see also Wagner*, 989 F.2d at 72 (reversing suppression order). Indeed, the magistrate's "finding of probable cause is itself a substantial factor

tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).  "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236).  Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

## I.      Rodriguez's and Molina's Standing to Contest a Search Warrant

As a preliminary matter, the Court considers whether Rodriguez and Molina had adequately established standing to bring their suppression challenges.  It is well settled that a defendant has no right to have evidence suppressed on Fourth Amendment grounds unless he demonstrates that he had a "legitimate expectation of privacy" in the area searched.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104–05 (1980) (citing *Rakas*, 439 U.S. at 131 n.1, and *Simmons v. United States*, 390 U.S. 377, 389–90 (1968)); *United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990).  "[A] defendant may demonstrate the infringement of his own legitimate expectation of privacy by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner." *Villegas*, 899 F.2d at 1333 (citations omitted). "A defendant who, at the time of the search, neither owned nor occupied the premises nor had any dominion or control over them has no standing to contest a search of the premises."  *Id.*

A showing of standing is required under the law because a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search

of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. "Only a defendant whose own privacy has been invaded can exclude evidence taken during the invasion." *United States v. Saint Prix*, 672 F.2d 1077, 1082 (2d Cir. 1982). Absent such a demonstration, the defendant lacks standing to challenge the search, and, therefore, the remedy provided by the exclusionary rule is unavailable. *See Rakas*, 439 U.S. at 134; *Rawlings*, 448 U.S. at 100; *Villegas*, 899 F. 2d at 1333.

This standing requirement applies as well to searches of cell site data—where the defendant must establish ownership or another possessory interest in the phone at the time for which the data is searched—as it does to searches of physical spaces. *See, e.g., United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) (denying a cell site challenge, holding that "[Defendant] does not have standing to assert Fourth Amendment rights in those phone records" because "he did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them," "[n]or did [Defendant] assert a privacy interest in the cell phones in some other manner."); *United States v. Serrano*, No. 13 Cr. 58 (KBF), 2014 WL 2696569, at *7 (S.D.N.Y. June 10, 2014) (denying standing to challenge cell site evidence where "[t]he defendant has not proffered an affidavit that he has a privacy interest in that phone or the data on that phone."). So, too, does it apply to searches of e-mail accounts. *See United States v. Lewis*, No. 16 Cr. 786 (NSR), 2018 WL 6241445, at *5 (S.D.N.Y. Nov. 29, 2018) ("A person has no expectation of privacy in another person's e-mail account.") (quoting *United States v. Lustyik*, 57 F. Supp. 3d, 213, 223 (S.D.N.Y. 2014)).

The defendant bears the burden of establishing that he had a reasonable expectation of privacy in the place searched and "must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest

in the searched premises at the time of the search." *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), aff'd, 44 F.3d 1102 (1995) (citations omitted); *see also, e.g., United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991) ("The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." (citing *Rakas*, 439 U.S. at 131 n.1; *United States v. Davis*, 932 F.2d 752 (9th Cir. 1991))). This burden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge. A defendant's unsworn assertion of the Government's representations does not meet this burden." *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted). Absent such a demonstration, the defendant lacks standing to challenge the search, and, therefore, the remedy provided by the exclusionary rule is unavailable. *See, e.g., Rakas*, 439 U.S. at 134.

Both Rodriguez and Molina have submitted affidavits or affirmations regarding their cell phones and iCloud accounts. (Affidavit of Brian Rodriguez ("Rodriguez Aff."), ECF No. 58; Affirmation of Anthony Molina ("Molina Aff."), ECF No. 56;) The Government concedes that these are sufficient to establish standing for the following: (1) the red iPhone taken from Rodriguez's house at his arrest; (2) data extracted from that red iPhone pursuant to the May 23 iPhone Warrant; (3) evidence, including Molina's black iPhone, obtained in conjunction with Molina's arrest; (4) data extracted from the black iPhone pursuant to the April 30 iPhone Warrant; and (5) DNA evidence obtained pursuant to the June 3 DNA Warrant. (Gov. Opp. at 22.) Specifically, the Government notes that Rodriguez and Molina each alleged a possessory interest in the iPhones and data at the relevant times for those searches.

The Government, however, challenges Rodriguez's standing as to several other aspects of the searches regarding: (1) the 1912 phone during the time periods for which the March 29 Cell

11

Site Warrant authorized the disclosure of data; and (2) any iCloud account in the August 29 iCloud Warrant.  Subsequently, Rodriguez submitted a supplemental affirmation that alleged a possessory interest in the 1912 phone, an iCloud account, and related data at the relevant times for those searches.  (Supplemental Affidavit of Brian Rodriguez ("Supp. Rodriguez Aff."), ECF No. 78.)

The Government also challenges Molina's standing as to the following: (1) the March 29 Cell Site Warrant regarding the 2454 number, the April 23 GPS Warrant regarding the 2454 number, and the April 29 Cell Site Warrant regarding the 1273 number; (2) the May 23 Cell Site Warrant—which authorized the disclosure of cell site data related to the 4879 phone; and (3) any iCloud account in the August 29 iCloud Warrant.  Subsequently, Molina submitted a supplemental affirmation that alleged a possessory interest in the 2454 and 1273 phones, two iCloud accounts, and related data at the relevant times for those searches, with one exception.[1]   (Supplemental Affirmation of Anthony Molina ("Supp. Molina Aff."), ECF No. 80.)

Accordingly, the Court concludes that both Rodriguez and Molina have sufficiently alleged standing for purposes of their Fourth Amendment motions.

## II.      Rodriguez's Suppression Motion

Rodriguez moves to suppress evidence obtained pursuant to the March 29 Cell Site Warrant, arguing that the affidavit omitted anonymous tips naming him as a participant in the 2017 New Milford Robbery (Rodriguez Br. 5–6), and evidence obtained as a result of the April 29 Rodriguez Triggerfish Warrant (namely, the iPhone seized at his arrest), the May 23 iPhone Warrant, and the August 29 iCloud Warrant, arguing that those affidavits improperly relied upon both: (1) evidence obtained pursuant to the March 29 Cell Site Warrant, which Rodriguez argues

---

[1] This exception is discussed below with regard to Molina's challenge to cell site data for Molina's 2454 phone obtained for the time around the 2017 New Milford Robbery.

is fruit of the poisonous tree; and (2) the same anonymous tip that Rodriguez argues should have been included in the affidavit for the March 29 Cell Site Warrant, which tip Rodriguez argues was insufficiently corroborated (Rodriguez Br. 6–12).

### a. March 29 Cell Site Warrant

Rodriguez contends that Special Agent Gray's ("SA Gray") March 29, 2019 search warrant affidavit ("March 29 Affidavit") for cell site data contained material omissions and failed to establish probable cause.  In particular, Rodriguez argues that SA Gray failed to include information he received regarding the two unidentified informants who appeared at the Connecticut State Police barracks claiming to have information about the New Milford robbery. Rodriguez argues this constitutes a material omission, rendering the affidavit misleading and lacking in probable cause.

To suppress evidence obtained pursuant to an affidavit containing erroneous information under the *Franks v. Delaware* analytical framework, 438 U.S. 154, 171 (1978), a defendant is required to show that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding."  *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)) (internal quotation marks and brackets omitted).

Rodriguez has met neither element here.  First, Rodriguez has not demonstrated that the omission was the result of the SA Gray's "deliberate falsehood or reckless disregard for the truth," especially because additional inculpatory information—in this case, a corroborated anonymous tip—would have bolstered the Government's application.  *See, e.g., United States v. Thomas*, 788 F.3d 345, 351 (2d Cir. 2015) ("[W]e cannot conclude that any omission here was made deliberately or with 'reckless disregard for the truth' when it is clear that full disclosure of the relevant

information would only have *strengthened* the search warrant application." (emphasis in original));
*Rajaratnam*, 719 F.3d at 155 ("[W]e cannot conclude that the government omitted certain information about the SEC investigation with 'reckless disregard for the truth' when it is clear that fully disclosing the details of that investigation would only have *strengthened* the wiretap application's 'necessity' showing.") (emphasis in original).

Second, the alleged omission was not necessary to Magistrate Judge Smith's finding of probable cause, as the affidavit set forth detailed allegations giving rise to probable cause to obtain cell site data for Rodriguez's 1912 phone.  SA Gray states that his application "was based on [his] participation in the investigation, [his] examination of reports and records, and [his] conversations with other law enforcement agents and other individuals, as well as [his] training and experience." (March 29 Warrant Aff. ¶ 3.)  He describes what he observed on the video of the robbery, fingerprint evidence, information gleaned from cell toll records, as well as social media accounts implicating Lauria, Rodriguez, and Molina.  (March 29 Warrant Aff. ¶ 8a–h, 9–12.)  The Court concludes that, in view of the totality of the circumstances set forth in the March 29 Cell Site Warrant Affidavit, the anonymous tip was not necessary to a finding of probable cause. Rodriguez's suppression motion is therefore denied as to evidence obtained pursuant to the March 29 Cell Site Warrant.

### b.  The April 29 Rodriguez Triggerfish Warrant, May 23 iPhone Warrant, and August 29 iCloud Warrant's Reliance on the March 29 Cell Site Warrant

Rodriguez's next suppression argument is that all evidence derived from subsequent search warrants must be suppressed as "fruit from the poisonous tree," and because the subsequent warrants repeat cumulative information from the March 29 Cell Site Warrant.  *See United States v. Wong Sun*, 371 U.S. 471, 484–85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994).  But absent a poisonous tree, there can be no fruit.  As the Court has declined to suppress

evidence obtained pursuant to the March 29 Cell Site Warrant, Rodriguez's argument fails as to the subsequent search warrants as well.

### c. April 29 Rodriguez Triggerfish Warrant

In contrast to the March 29 Cell Site Warrant, the April 29 Triggerfish Warrant relied, in part, on the anonymous tip. Rodriguez argues that there was insufficient corroboration of the anonymous informants to establish probable cause for this warrant. Specifically, Rodriguez notes that the April 29 Triggerfish Warrant failed to corroborate the information obtained by Connecticut State Police and omitted the following: (1) that the informants refused to identify themselves; (2) how either informant knew Mr. Rodriguez or could even identify him; and (3) the informants' purported motive in coming forward: because "Lauria turned on [the informant's] brother."

The Court is not persuaded that these omissions are significant. The affidavit identified the tipsters as anonymous. (April 29 Triggerfish Warrant Aff. ¶ 17.) The affidavit also includes that the tipster identified Rodriguez by watching the video of the robbery posted online by the NMPD. (April 29 Triggerfish Warrant Aff. ¶ 17). Finally, the informant's stated motivation for coming forward—animus toward Lauria—does not appear to bear on the tipsters' identification of Rodriguez. The Court declines to suppress evidence obtained from the April 29 Triggerfish Warrant on these grounds.

### III. Molina's Suppression Motion

Molina moves to suppress evidence seized pursuant to a series of warrants: the March 29 Cell Site Warrant; the April 23 GPS Warrant; the April 29 Molina Triggerfish Warrant; the April 29 Cell Site Warrant; the April 30 iPhone Warrant; the May 23 Cell Site Warrant; the June 3 DNA Warrant; and the August 29 iCloud Warrant.

### a.  Two Errors in March 29 Cell Site Warrant Affidavit

Molina argues that the Court should suppress evidence seized pursuant to the March 29 Cell Site Warrant related to Molina's 2454 T-Mobile number because the gravamen of the probable cause set forth in SA Gray's affidavit relies upon two significant misrepresentations.  The Government concedes the March 29 Cell Site Warrant Affidavit contained two erroneous statements, and provides the following corrected statements:

| Erroneous statement | Statement as corrected by the Government |
|---|---|
| "Based on my review of cell tower log information from the closest cell tower to the Mahopac Store, I have learned that [Lauria's 3972 phone], [Molina's 2454 phone], and [Rodriguez's 1292 phone] were all in the vicinity of the Mahopac Store on February 19, 2019." (March 29 Cell Site Warrant Aff. ¶ 13). | Based on my review of cell tower log information from the closest cell towers to the Mahopac Store, I have learned that [Lauria's 3972 phone], [Molina's 2454 phone], and [Rodriguez's 1292 phone] were all in the vicinity of the Mahopac Store on February 19 15, 2019, minutes before the robbery, and, while located by the Mahopac store, [Lauria's 3972 phone] called only two phones: [Molina's 2454 phone] and [Rodriguez's] 1912 phone.] I have not yet received cell tower information to show where [Molina's 2454 phone] was at that time.[2] |
| "Toll records for [Lauria's 3972 phone] reflect that on August 10, 2017, shortly before and after the New Milford Store robbery, [Lauria's 3972 phone] was in communication with [Molina's 2454 phone] and [Rodriguez's 1912 phone]." (March 29 Cell Site Warrant Aff. ¶ 8(i)) | Toll records for [Lauria's 3972 phone] reflect that, on August 10, 2017, shortly before and after the New Milford Store robbery, [Lauria's 3972 phone] was in communication with [Molina's 2454 phone] and [Rodriguez's 1912 phone], and that, on February 15, 2019, shortly before and after the Mahopac Store robbery, [Lauria's 3972 phone] was in communication with [Molina's 2454 phone] and [Rodriguez's 1912 phone].[3] |

---

[2] Molina clarifies that it was Molina who called Lauria.  (*See* Molina's Reply Brief ("Molina Repl."), ECF No. 79, at 12–13 (citing Exs. S & V).)  The Government does not dispute this in its sur-reply.

[3] Molina presents an additional correction to the Government's correction: On February 15, 2019, Lauria's 3972 phone was in communication with Molina's 2454 phone and Rodriguez's 1912 phone only before—and not after—the Mahopac Store robbery.  (*See* Molina Repl. at 7–12 (citing Exs. S–X).)  The Government does not dispute this in its sur-reply.

(*See* Gov. Opp. at 41 (comparison added).)

*First*, Molina emphasizes that the T-Mobile cell tower log information does *not* identify Molina's 2454 phone number as one of the numbers using the T-Mobile towers in February 2019 during the Mahopac Robbery.  This statement should not have been included in paragraph 13 of the March 29 Cell Site Warrant Affidavit; the Government explains that all three co-defendants' phone numbers appeared on the logs, but that only Lauria's 3972 number was recorded actually using the cell tower near the Mahopac store.  (*Id.* at 42.)  *Second*, Molina highlights that Lauria's toll records do not show that Molina's 2454 phone communicated with Lauria's number in August 2017 at all.  This statement should not have been included in paragraph 8 of the March 29 Cell Site Warrant Affidavit; the Government attributes this error to a "misreading of records," which conflated the February 2019 records with the August 2017 records.  (*Id.* at 41–42.)  Both errors were repeated verbatim in the April 23 GPS Warrant Affidavit.  (April 23 GPS Warrant Aff. ¶¶ 9(i), 15.)

### i.   *Franks* Standard

"There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  As briefly discussed above, "[a] defendant[, however,] may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  To be entitled to a *Franks* hearing, the proponent's position must be "more than conclusory and must be supported by more than a mere desire to cross-examine."  *Id.*

The defendant "must make a 'substantial preliminary showing' that a false statement was made in the search warrant affidavit either 'knowingly and intentionally' or with 'reckless

disregard for the truth,' and that 'the allegedly false statement is necessary to the finding of probable cause.'"  *United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) (quoting *Franks*, 438 U.S. at 155–56).  "A misrepresentation or omission is intentional when 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'"  *Awadallah*, 349 F.3d at 64 (quoting *United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000)).  To meet this standard, a defendant must support his allegations of deliberate falsehood with "an offer of proof."  *United States v. Cook*, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004) (quoting *Franks*, 438 U.S. at 171).

The materiality inquiry rests on a determination of whether the "alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding."  *Awadallah*, 349 F.3d at 64–65.  Typically, to ascertain materiality, a Court should: (1) "disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant"; and (2) uphold the search warrant if "the corrected affidavit supports probable cause."  *Id.* at 65 (quoting *Canfield*, 212 F.3d at 718).

### ii.   *Franks* **Analysis**

The Court first addresses whether the two erroneous statements were material, *i.e.*, "necessary to the finding of probable cause."  *Franks*, 438 U.S. at 156.  To assess materiality, the Court must disregard the false statements and analyze whether there would still be probable cause to obtain cell site information for Molina's 2454 phone for the time around the 2019 Mahopac Robbery.[4]  Read in its totality, a corrected affidavit would allege:

- the 2017 New Milford Robbery was committed at approximately 7:45pm by a three-man crew, one of whom acted as a getaway driver in a Honda with distinctive rims (March 29 Cell Site Warrant Aff. ¶ 8);

---

[4] The Court focuses only on the 2019 Mahopac Robbery, because Molina has disavowed any legally cognizable privacy interest in the 2454 phone cell site data at the time of the 2017 New Milford Robbery.  (*See* Supp.

- Lauria had entered or exited the New Milford Verizon store around the time of the 2017 New Milford Robbery (*id.* ¶ 8(h);

- the 2019 Mahopac Robbery was committed at approximately 7:45pm by a three-man crew, one of whom acted as a getaway driver in a Honda with distinctive rims (*id.* ¶ 12);

- one of the robbers who went into the store in the 2019 Mahopac Robbery was called "Brian" (Rodriguez's first name) by the other robber (*id.* ¶ 12(g));

- in both the 2017 New Milford Robbery and the 2019 Mahopac Robbery, the two robbers (who did not act as the getaway driver) entered the store. One pointed a gun at the employees and restrained the employees with zip ties while the other walked to the back of the store and stole tens of thousands of dollars worth of cell phones and other electronic devices before they walked out and got into the Honda to drive away (*id.* ¶¶ 8, 12);

- Lauria is Facebook friends with Molina and Rodriguez (*id.* ¶ 11);

- Lauria's 3972 cell phone communicated with Rodriguez's 1912 phone shortly before and after the 2017 New Milford Robbery (*id.* ¶ 8(i));

- Lauria's 3972 phone communicated with Molina's 2454 phone and Rodriguez's 1912 phone shortly before the 2019 Mahopac Robbery (*id.* ¶ 14) [5]; and

- Lauria's 3972 phone and Rodriguez's 1912 phone were both in the vicinity of the 2019 Mahopac Robbery minutes before the robbery (*id.* ¶ 13).

As corrected, the evidence in the affidavit linking Molina to either robbery is meager. The only statements involving Molina are: (1) that Lauria's 3972 phone was in communication with Molina's 2454 phone twice in the hour or so before the 2019 Mahopac Robbery; and (2) the tenuous observation that Molina was Facebook friends with both Lauria and Rodriguez. Whereas other statements place Lauria and Rodriguez at the scene, there is nothing placing Molina in the vicinity of either store. Moreover, nothing links Molina to the Honda. Though probable cause "is

---

Molina Aff. ¶ 3 ("The [2454] T-Mobile cellular telephone number was mine from February 8, 2018 through and until at least April 30, 2019."); Molina Mot. at 8 n.7 ("Mr. Molina's 2454 T-Mobile number did not belong to ASA Cornerstone and was not in use by Mr. Molina in 2017.").)

[5] As noted above and illustrated in Molina's briefing, Lauria's 3972 phone was in communication with Molina's 2454 phone only twice before—and not after—the Mahopac Store robbery. (*See* Molina Repl. at 7–12 (citing Exs. S–X).)

not a high bar" to clear, *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 134 S.Ct. 1090, 1103 (2014)), one social media connection and two calls—with nothing more to suggest Molina's participation in either robbery—is simply not enough to demonstrate "the probability . . . of criminal activity." *Wagner*, 989 F.2d at 72. As such, in view of the totality of the circumstances, the Court readily concludes that the false statements were "necessary to the [issuing] judge's probable cause finding." *Awadallah*, 349 F.3d at 64–65.

### iii. Applicability of the Corrected Affidavit Doctrine

Perhaps anticipating that probable cause would be defeated by this exercise, the Government urges the Court to apply the "corrected affidavit doctrine" to supplement the content of the affidavit with "additional information" that was possessed "at the time [the Government] sought the … warrant." *Ganek v. Leibowitz*, 874 F.3d 73, 85 n.6 (2d Cir. 2017). Specifically, the Government wishes to include that, minutes before the 2019 Mahopac Robbery, Lauria's 3972 phone communicated with exactly two phones: Molina's 2454 phone and Rodriguez's 1912 phone. (Gov. Opp. at 41.) Because the Court determines that the inevitable discovery rule applies, it declines to reach the issue of the applicability of the corrected affidavit doctrine in this context.

### b. April 29 Molina Triggerfish Warrant

Molina argues that the April 29 Molina Triggerfish Warrant Affidavit failed to point out two issues regarding the anonymous tipsters: (1) their anonymity and (2) the fact that the FBI had not yet corroborated one aspect of the anonymous tip, namely, Molina's use of the 9885 number. The Court refers to its discussion above regarding the anonymous tip relied upon by the April 29 Rodriguez Triggerfish Warrant. Again, the affidavit was clear that the informants were anonymous. As to the 9885 number, the affidavit never asserted—whether directly or by implication—that law enforcement had corroborated the 9885 number. To the contrary, it specifically stated that there was corroboration for the tipster's identification of (1) the 3972

number as belonging to Lauria (April 29 Molina Triggerfish Warrant Aff. ¶¶ 17(c), 18(i));  and (2) the 1912 number as belonging to Rodriguez (April 29 Molina Triggerfish Warrant Aff.  ¶¶ 17(c), 19(c)–(e)).  However, while stating that the tipster had identified Molina's number as the  9885 number (April 29 Molina Triggerfish Warrant Aff. ¶ 17(c)), the affidavit only set forth corroboration of the 2454 number as Molina's (April 29 Molina Triggerfish Warrant Aff. ¶ 27(c)).  Accordingly, the Court cannot conclude that these omissions were "necessary to the [issuing] judge's probable cause finding." *Awadallah*, 349 F.3d at 64–65.

### c.   Inevitable Discovery Doctrine

The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  The doctrine "is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006).  The inevitable discovery doctrine requires the "district court to determine, 'viewing affairs as they existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred.'" *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992)).  The Government "bears the burden of proving inevitable discovery by a preponderance of the evidence."  *Id.*  Proof of inevitable discovery "'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*.'" *Id.* (quoting *Eng*, 971 F.2d at 859) (emphasis in original).

The Government maintains that even had the magistrate rejected a corrected affidavit for the March 29 Cell Site Warrant, the FBI would inevitably have submitted an amended affidavit, supplemented with information about the anonymous tip identifying Molina, Lauria, and Rodriguez as the robbers.  In response, Molina argues that application of the inevitable discovery

doctrine would be inappropriate, as it would undermine deterrence of police conduct that violates Fourth Amendment rights.  While the Court is troubled by the "recurring pattern of errors" highlighted in Molina's briefing, the Court will not eschew the inevitable discovery rule at this time.

The Government persuasively argues that it would have been able to remedy the three main errors of which Molina complains: (1) the Government did not have evidence by March 29, 2019 that Molina's phone was in contact with Lauria's or Rodriguez's phones on the date of the 2017 New Milford Robbery; and (2) the Government did not have evidence by March 29, 2019 that Molina's phone was near the Mahopac Robbery on the day and near the time of that robbery; and (3) law enforcement had not corroborated that the 9885 number provided by the anonymous tipsters for Molina was, in fact, his number.  The Government presents avenues by which each error has been remedied independently of any warrants challenged by Molina.  (Gov. Opp. at 49– 50.)  Given these independent means of obtaining the challenged information, the Court has a high level of confidence that such evidence would have inevitably been obtained.  The Court therefore finds that the Government has met its burden, by a preponderance of the evidence, that the discovery of the disputed evidence would in fact have occurred.  Molina's suppression application—as to the March 29 Cell Site Warrant, April 29 Triggerfish Warrant, and subsequent warrants on the same grounds or as "fruit of the poisonous tree"—is therefore denied.

Accordingly, even if the Court were to find that Molina had made a substantial preliminary showing that the challenged statements were the result of SA Gray's deliberate falsehood or

reckless disregard for the truth, a *Franks* hearing is not warranted due to the inevitable discovery doctrine.

### d.  April 30 Seizure of Molina's iPhone

Molina further argues that his iPhone should be suppressed because it was seized without a search warrant.  On April 30, 2019, after arresting Molina, who was in his basement bedroom, law enforcement recovered his iPhone.  (Molina Mot. Ex. Q.)  The FBI's report describes the recovery as follows:

> Agents identified a closed door that led to a bedroom.  Arrest team called for Molina to come to the steps, which he did. Molina was taken into custody without incident. . . . While clearing the basement bedroom where Molina was, Agents recovered one cell phone on Molina's bed. . . [W]riter placed a call to [the 2454 number] . . . . The phone on the bed then rang and identified the number writer had called from.

(*Id.*)  According to this report, the iPhone was in plain view on the bed in the bedroom where Molina was when he was arrested.  *See Maryland v. Buie*, 494 U.S. 325, 334 (1990) (holding that officers executing an arrest in a home may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."); *Minnesota v. Dickerson*, 508 U.S. 366, 374–75 (1993) (under the plain view doctrine, if "police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."); *United States v. Delva*, 858 F.3d 135, 147 (2d Cir. 2017) ("[W]e see no error in the district court's findings that the cellphone and letters—recognizable as likely evidence (cellphones having been used in the kidnapping/robbery, and the letters being post-kidnapping/robbery communications between two of the charged coconspirators)—were in plain view in the second bedroom").

Molina, however, contests that his iPhone was in plain view.  (Supp. Molina Aff. ¶ 4 ("That iPhone was not out in the open sitting on my bed at the time of my arrest.")  Therefore, there is a disputed issue of fact regarding the seizure of Molina's iPhone, and an evidentiary hearing is warranted.

### e.  August 29 iCloud Warrant

Molina also argues that the August 29 iCloud Warrant improperly permitted the seizure of evidence of aggravated identity theft, a crime for which probable cause was not established in the accompanying affidavit.  The August 29 iCloud Warrant sought evidence linked to violations only of "violations of Title 18, United States Code, Sections 1951 (Hobbs Act Robbery), and 924(c) (use of a firearm during and in relation to a of a crime of violence) (collectively, the 'Subject Offenses') involving Brian Rodriguez, Anthony Lauria, and Anthony Molina . . . ."  (August 29 iCloud Warrant, Attachment A, Section III.)  No other criminal statutes were identified. Nevertheless, Attachment A's list of "Information to be Seized by the Government" exceeded that which could be linked to a § 1951 or § 924(c) violation.  It identifies items related to "aggravated identity theft" spanning a period of nearly two years.  (*Id.* at Attachment A, ¶ III(d).)

As a result, the August 29 iCloud Warrant was facially overbroad.  In this case, "the portion of the warrant that is constitutionally infirm . . . for lack of . . . probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."  *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013) (citation omitted).  All evidence untethered from the specified offenses, *i.e.*, violations of 18 U.S.C. §§ 924(c) and 1951, must be suppressed.  The Court therefore strikes the paragraph that permitted the search for, and seizure of, "[e]vidence regarding [Molina's] commission of aggravated identity theft" (August 29 iCloud Warrant, Attachment A, ¶ III(d)), and directs that all evidence seized pursuant to that paragraph be suppressed unless it could have seized on a basis beyond that

paragraph.  The rest of the warrant, however, still stands.  *See, e.g., United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992) ("When a warrant is severed (or redacted) the constitutionally infirm portion . . . is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted.").  After the Government has identified its exhibits, Molina may object if he determines that the Government has, in fact, sought to introduce evidence obtained solely via the offending paragraph of the warrant.

### f.   Motion to Compel Discovery

Molina seeks, in his reply brief, to compel discovery he claims is "material to preparation of the defense" pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E).  Molina includes broad requests for documents and communications between SA Gray and Assistant United States Attorney Lindsey Keenan relating to the investigation and SA Gray's affidavits.  Molina does not explain how such documents he seeks are discoverable and/or admissible.  The Court sees no justification to compel such discovery, and as such this request is denied.

## IV.   <u>Motions for Severance</u>

Each of the defendants moves to sever his trial from that of his co-defendants.  Rodriguez argues that the jury will be unduly prejudiced by the overwhelming DNA evidence against Molina.  Molina argues that the case against Lauria and Rodriguez is so strong that it would inevitably prejudice him.  Lauria argues that the defendants may present antagonistic defenses, there may be co-defendant statements that need to be redacted, and that the jury will be unduly prejudiced by the overwhelming DNA evidence against Molina. The government, however, argues that Defendants have failed to overcome the strong presumption in favor of a joint trial.  For the reasons stated below, Defendants' motions to sever the trial are denied.

As the Supreme Court has explained, the "preference in the federal system [is] for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993).

25

Joint trials seek to promote "economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 121 n.6 (1968) (internal quotations omitted). "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d at 115; *see United States v. Pirro*, 76 F. Supp.2d 478, 483 (S.D.N.Y. 1999) ("[T]he cases are legion that there is a strong public interest in joint trials where . . . the defendants are . . . charged in the same conspiracy").

Under Rule 14(a) of the Federal Rules of Criminal Procedure, however, courts may "order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires" in cases where "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." To demonstrate that severance is proper, a defendant must establish substantial prejudice. *See United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant prejudice so great as to deny [him or her] a fair trial."). "Substantial prejudice does not simply mean a better chance of acquittal." *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984), *cert. denied*, 469 U.S. 934 (1984). Rather, the prejudice of a joint trial must constitute a "miscarriage of justice." *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997) (quoting *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993)). And even when the risk of prejudice is great, limiting instructions will often "suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 33 F.3d 110, 114 (2d Cir. 2003). Thus, severance is generally warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 509 U.S. at 539.

26

### a. Prejudicial Spillover

As the Second Circuit has held, severance may be warranted where there is a risk of "prejudicial spill over." *United States v. Salameh*, 152 F.3d 88, 115–16 (2d Cir. 1998). In other words, "'[p]rejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *Id.*; *see also Zafiro*, 509 U.S at 539 ("Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant [] might present a risk of prejudice."). Nevertheless, "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111.

Rodriguez and Lauria each argue that "it will be impossible for a jury to keep [DNA] evidence [identifying Molina] separate as to this defendant and co-defendant Molina, they will be unduly influenced by the DNA Report." (Rodriguez Mot. at 19; Lauria Mot. at 4). And Molina argues that he "will be severely prejudiced from the subject matter and volume of evidence implicating his co-defendants," including video surveillance, fingerprints, the use of the name "Brian" during a robbery, telephone evidence, and possible 404(b) evidence. (Molina Mot. at 40–41).

The Court does not find substantial prejudice would result if the trials were not severed. Each of the defendants' participation in the robbery schemes would be otherwise admissible against the others in a separate trial as proof of the existence of the charged criminal conspiracy. *See Salameh*, 152 F.3d at 111. Notably, no defendant points to any evidence that would be admissible against a co-defendant but inadmissible against himself. In any event, even if the potential for prejudicial spillover did exist, Defendants fail to establish that a limiting instruction would not suffice to cure any risk of unfair prejudice.

27

The Court concludes that there is no basis for severance.  *See United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) ("'[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983))); *United States v. Feola*, 651 F. Supp. 1068, 1123-24 (S.D.N.Y. 1987) ("[I]t is well established that 'simply because the evidence against codefendants is stronger or that one defendant's role in the crime is lesser than that of others is not sufficient reason to grant a severance'").

### b.   Lauria's Claims of Antagonistic Defenses

Lauria argues that the Defendants "may" have antagonistic defenses due to the "juxtaposition of the indictment's varied allegations against the differing defendants," which he argues "plainly presents an antagonism in the defendants' respective trial defenses."  Lauria has not defined the contours of those potential defenses and how they might conflict, and it is not plain to the Court.  "In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that 'acceptance of one party's defense would tend to preclude the acquittal of [the] other.'"  *Salameh*, 152 F.3d at 116.  Lauria has not suggested any facts that would lead to this conclusion.  The Court will not sever the trial on this basis.

### c.   Lauria's Concern About Co-Defendant Statements

Lauria also expresses concern regarding the prospect of statements of a co-defendant being offered against him.  The Court recognizes that "a post-arrest statement made by a nontestifying defendant which facially incriminates a co-defendant is inadmissible at their joint trial despite a limiting instruction to the jury because it violates the co-defendant's right to cross-examination."  *United States v. Romero*, 897 F.2d 47, 53 (2d Cir. 1990).  Although these situations sometimes warrant severance, district courts nevertheless have the discretion to instead order redactions that

"eliminate any directly incriminating references to [] co-defendants," and to give "the jury a proper limiting instruction."  *Id*; *see also United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989).

The Government has consented to making redactions if it offers any such statement, which moots the issue.  Further, Defendants have failed to identify any co-defendant statement that is facially incriminating.  *See United States v. Piervinanzi*, No. 5th S 89 Cr. 229(PKL), 1990 WL 139021, at *3 (S.D.N.Y. Sept. 18, 1990) ("Unless and until counsel for Marchese identifies statements made by a co-defendant which facially incriminate Marchese, the motion for severance based on *Bruton* must be denied").  Either way, severance under *Bruton* is not warranted.

**V.**    **Motion to Disclose Rule 404(b) Evidence and Other Crimes Evidence Prior to Trial**

Regarding Rule 404(b) material, the Government has stated that it will comply with the "Court's rules and the law regarding the timing of 404(b) disclosures," which "only requires 'reasonable notice in advance of trial' for the admission of prior convictions and bad acts." *United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007).  The request for 404(b) materials is denied without prejudice at this time, and may be discussed further at the September 25, 2020 pretrial conference.

**VI.**    **Motions for Disclosure of *Brady*, *Giglio*, or 3500 Material**

To date, the Government advises it is unaware of any potential *Brady* material, but will provide timely disclosure to the Defendants if any *Brady* material comes to light.   As the Government has acknowledged its obligations under *Brady*, Defendants' motions are either moot or premature in the absence of an alleged discovery violation.  The requests are therefore denied without prejudice to renew.  *See, e.g.*, *United States v.  Santana*, No. 13 Cr. 147 (KMW), 2015 WL 5781413, at *3 (S.D.N.Y. Oct. 1, 2015) (denying motion to produce *Brady* material because

"[t]he Government states that it is aware of its obligations under Brady, but that, to date, it is unaware of any Brady material regarding the Defendants").

With respect to Lauria and Rodriguez's request for all impeachment material to be disclosed, the Government also advises that it understands its obligations under *Giglio*, its progeny, and the Jencks Act, 18 U.S.C. § 3500.  As the Government represents that it intends to provide the defense with *Giglio* material prior to trial, and is willing to confer with the Defendants on a reasonable disclosure schedule, this request is also denied without prejudice to renew.

**VII.**   **Motion for Inspection of Grand Jury Records**

Lauria generally seeks the release of "the records of the grand jury," and appears to request two categories of information: (1) records relating to "how the grand jury was drawn, summoned, or selected" and (2) records about what occurred before the grand jury, such as whether the jurors were "properly instructed on the law" and "heard all of the evidence."

### a.   How the Grand Jury Was Drawn, Summoned, or Selected

With respect to the first category, under 28 U.S.C. § 1867(a), a defendant may move to dismiss the indictment "on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury."  In preparation for such a motion, a defendant is entitled to inspect the "content of records or papers used by the jury commission or clerk in connection with the jury selection process." 28 U.S.C. § 1867(f).  Thus, a defendant is generally entitled to some records relating to the "how the grand jury was drawn, summoned, or selected."

Similar motions recently have been made in numerous other cases, in which defendants indicted very recently have made particularized requests regarding the process for selecting the grand jury venire.  In order to determine whether there are documents that are responsive to these requests to which the defendants are entitled, the Honorable Katherine Polk Failla, United States District Judge for the Southern District of New York, scheduled a call with the Jury Administrator

for the Southern District of New York and invited defense counsel in several cases to join the call on June 30, 2020. *United States v. Souleymane Balde*, 20 Cr. 281 (KPF), Dkt. No. 21.

Lauria has presented similarly particularized requests. (*See* Anthony Lauria Letter Reply, ECF No. 81.)  The Government has represented that it is prepared to produce to him the same categories of documents that it (or the court) will be producing to other defendants.  This motion is therefore denied as moot.

The Court notes that the indictment in this case was filed on June 17, 2019, well over seven days ago.  The question of whether any motion Lauria attempts to bring under 28 U.S.C. § 1867(a) is timely, however, will be addressed if and when a motion is actually filed.  *See United States v. Saipov*, No. S1 17-CR-722 (VSB), 2020 WL 915808, at *3 (S.D.N.Y. Feb. 26, 2020) ("[S]ince Defendant only seeks information and records at this time, I will defer decision on timeliness until a motion challenging the selection and composition of the Grand Jury.").

### b.  What Occurred Before the Grand Jury

With respect to the second category, the law is clear that Lauria is not entitled to such information.  It is settled law that "grand jury proceeding[s] [are] accorded a presumption of regularity," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (internal quotation marks omitted).  Given this, there has been a "long-established policy that maintains the secrecy of grand jury proceedings in the federal courts." *Dennis v. United States*, 384 U.S. 855, 869 (1966) (internal quotation marks omitted).  Breaking grand jury secrecy constitutes "extraordinary relief." *United States v. Shaw*, No. S1 06 CR 41 (CM), 2007 WL 4208365, at *6 (S.D.N.Y. Nov. 20, 2007) (internal quotation marks omitted).

Rule 6(3)(E)(ii) of the Federal Rules of Criminal Procedure permits limited disclosure of information in this category.  It allows for disclosure "at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the

grand jury." Fed. R. Crim. P. 6(3)(E)(ii). In order to invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, No. 05-CR-127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005).

Here, there is a facially valid indictment and Lauria makes no claim that would establish a particularized need or compelling necessity justifying disclosure of matters occurring before the grand jury. Lauria's request for this information is therefore denied.

## VIII. Motion to Dismiss Count Four of the Indictment for Failure to State a Claim

Lauria moves, *pro se*, to dismiss Count Four of the Indictment for failure to state a claim, arguing that, in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015), Section 924(c)'s so-called residual clause, 18 U.S.C. § 924(c)(3)(B), is unconstitutionally vague and that a Hobbs Act robbery is therefore no longer a "crime of violence" for the purposes of Section 924(c) because it does not qualify as a crime of violence under the remaining so-called force clause or elements clause. (*See Pro Se* Lauria Mot.) This motion must be denied. Although Section 924(c)'s residual clause is unconstitutionally vague, *see United States v. Davis*, 139 S. Ct. 2319, 2327–33 (2019), a substantive Hobbs Act robbery offense categorically remains a valid predicate crime of violence under the elements clause, *see United States v. Hill*, 890 F.3d 51, 53 (2d Cir. 2018), which remains the law even after *Davis*, *see United States v. Barrett*, 937 F.3d 126, 128–29 (2d Cir. 2019).

## CONCLUSION

For the foregoing reasons, Defendants Motions are GRANTED in part and DENIED in

part.  Defendant Molina's motion is granted insofar as it (1) seeks an evidentiary hearing to resolve

the validity of the seizure of Molina's iPhone; and (2) seeks to suppress evidence seized pursuant

to ¶ III(d) of the August 29 iCloud Warrant, unless the evidence could have been seized on a

separate basis.  All other aspects of Defendants' Motions are DENIED.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 52,

54, and 60.


Dated:    September 24, 2020                                SO ORDERED:
          White Plains, New York


                                                _____
                                                        NELSON S. ROMÁN
                                                  United States District Judge